CLERK'S OFFICE U.S. DIST. COURT
AT DANVILLE, VA
FILED

APR 12 2024

LAURA A. AUSTIN, CLERK
BY:  s/ H. MCDONALD
          DEPUTY CLERK

## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### Danville Division

ROBERT HENSLEY and ROBIN
HENSLEY, as Co-Administrators of the
Estate of Brad S. Hensley, deceased,

      Plaintiffs,

      v.

WELLPATH, LLC,
SARAH EVES, P.A.,
CHRISTOPHER ADKINS, R.N.,
DEBORAH DAMRON, L.P.N.,
MEGAN ADKINS, R.N.,
RAVEN MARTIN, L.N.A.,
JACQUELINE HALL, L.N.A.,
KASSIE VANHOUSEN, R.N.,
SIERRA GLENN, L.N.A.,
LT. DEAN SHUMATE,

      and

FORMER SHERIFF LANE PERRY.

      Defendants.

Case No.  4:24CV00014

## COMPLAINT

Plaintiffs Robert Hensley ("Mr. Hensley") and Robin Hensley ("Mrs. Hensley"), (collectively, "Plaintiffs"), as Co-Administrators of the Estate of Brad S. Hensley ("Brad"), deceased, by counsel, hereby file this Complaint seeking judgment against Defendants Wellpath, LLC ("Wellpath"), Sarah Eves, P.A. ("PA Eves"), Christoper Adkins, R.N. ("RN Adkins"), Deborah Damron, L.P.N. ("LPN Damron"), Megan Adkins, R.N., ("RN M. Adkins"), Raven Martin, L.N.A. ("LNA Martin"), Jacqueline Hall, L.N.A. ("LNA Hall"), Kassie Vanhousen, R.N. ("RN Vanhousen"), Sierra Glenn, L.N.A. ("LNA Glenn"), First Lt. Dean Shumate ("Lt. Shumate")

and Former Sheriff Lane Perry ("Sheriff Perry") (collectively, "Defendants"). In support of their claims against Defendants, Plaintiffs respectfully allege as follows:

## INTRODUCTION

1.      On August 2, 2022, Brad Hensley (born Nov. 12, 1979, deceased Aug. 6, 2022) entered the Henry County Adult Detention Center as a pretrial detainee. As his medical providers and custodians, Defendants owed him specific duties of care under state and federal law. Moreover, Brad, upon intake, immediately and promptly informed Defendants of a serious, potentially fatal adrenal disorder and strict regimen of prescribed medications that he needed to take on a daily basis to prevent a life-threatening, adrenal crisis. Defendants delayed and denied him these medications, causing him acute illness and physical distress. Defendants then neglected Brad as he quickly became sick with adrenal crisis and attendant physiological distress, could not eat, and decompensated into plain helplessness and deathly illness. Despite pleas by Brad, his family, fellow detainees, and others, Defendants ignored his distress and refused him the necessary medication and eventual emergent care that he needed as a consequence. Defendants refused Brad the assessments, monitoring, and care required by the standards of care and their own protocols. Even worse, one or more of them fabricated false records to conceal the breaches, and they failed to keep other contemporaneous records of Brad's medical condition and events while he was a pretrial detainee. As a result of multiple breaches of their duties to Brad, as more fully alleged *infra*, Defendants' tortious and unconstitutional conduct caused Brad to die a predictable, painful, but easily preventable death in the Jail early on the morning of Saturday, August 6, 2022. This lawsuit follows.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction over Plaintiffs' 42 U.S.C. § 1983 claim pursuant to 28 U.S.C. §§ 1331, 1343(a)(3), (4), and has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

3.      The primary events and tortious acts and omissions at issue occurred in Henry County, Virginia, in the Western District of Virginia, where Brad Hensley was a pretrial detainee at the Henry County Adult Detention Center (HCADC) from August 2, 2022, until he died there on August 6, 2022.

4.      Under 28 U.S.C. § 1391(b)(2) and Local Rule 2, venue is proper in the United States District Court for the Western District of Virginia, Danville Division.

## PARTIES

5.       Plaintiffs Robin and Robert Hensley are Brad's parents and reside in Henry County, Virginia.  Plaintiffs duly qualified as co-administrators of the Estate of Brad S. Hensley in Henry County on October 11, 2022.  At the time of the events alleged herein, Brad Hensley was a pretrial detainee held at the Henry County Adult Detention Center **(**"HCADC" or the "Jail"), located in Henry County, Virginia.

6.      At all times relevant, Defendant Wellpath, LLC ("Wellpath") was a limited liability company under contract with HCADC to provide medical care to the inmates and detainees being held at the Jail.  The contract further required Wellpath to develop all necessary policies and procedures to ensure that the medical care provided at the Jail complied with the requirements of applicable law, to include federal and state law.  Wellpath is organized under Delaware law, with its principal business office address in Nashville, Tennessee.  Wellpath's registered agent in

Virginia is Corporate Creations Network Inc., located at 425 W Washington St. Ste 4, Suffolk, VA, 23434.

7.      Wellpath had contractual and common law duties to administer, manage, supervise, and deliver health care services to inmates or detainees of HCADC, including Brad.  Alternatively, Wellpath assumed such duties by virtue of a certain December 1, 2021, contract under which Wellpath and its agents and employees were obligated to provide legally adequate medical care to the inmates and detainees of the Jail.

8.      Defendant Sarah Eves, P.A. (a/k/a Sarah Perry) is, upon information and belief, presently a resident of Pocahontas County, West Virginia. At all relevant times, PA Eves was employed by Wellpath to provide medical care to the inmates and detainees being held at the Jail. At all relevant times, PA Eves acted in the course and scope of her employment and/or agency relationship with Wellpath and under color of state law.  PA Eves was Brad's medical provider while Brad was incarcerated at HCADC.  PA Eves is sued in her individual capacity.

9.      Defendant Christopher Adkins, R.N., is, upon information and belief, presently a resident of Henry County, Virginia. At all relevant times, RN C. Adkins was employed by Wellpath to provide medical care to the inmates and detainees being held at the Jail.  At all relevant times, RN C. Adkins acted in the course and scope of his employment and/or agency relationship with Wellpath and under color of state law.  RN C. Adkins is sued in his individual capacity.

10.     Defendant Deborah Damron, LPN, a/k/a Deborah Rutledge, is, upon information and belief, presently a resident of Kentucky.  At all relevant times, LPN Damron was employed by Wellpath to provide medical care to the inmates and detainees being held at the Jail.  At all relevant times, LPN Damron acted in the course and scope of her employment and/or agency

Case 4:24-cv-00014-TTC-CKM    Document 1    Filed 04/12/24    Page 5 of 23
Pageid#: 5

relationship with Wellpath and under color of state law.  LPN Damron is sued in her individual capacity.

11.    Defendant Megan Adkins, R.N., is, upon information and belief, presently a resident of Martinsville, Virginia. At all relevant times, RN M. Adkins was employed by Wellpath to provide medical care to the inmates and detainees being held at the Jail.  At all relevant times, RN M. Adkins acted in the course and scope of her employment and/or agency relationship with Wellpath and under color of state law.  RN M. Adkins is sued in her individual capacity.

12.    Defendant Raven Martin, L.N.A., is, upon information and belief, presently a resident of Henry County, Virginia. At all relevant times, LNA Martin was employed by Wellpath to provide medical care to the inmates and detainees being held at the Jail.  At all relevant times, LNA Martin acted in the course and scope of her employment and/or agency relationship with Wellpath and under color of state law.  LNA Martin is sued in her individual capacity.

13.    Defendant Jacqueline Hall, L.N.A., is, upon information and belief, presently a resident of Stuart, Virginia. At all relevant times, LNA Hall was employed by Wellpath to provide medical care to the inmates and detainees being held at the Jail.  At all relevant times, LNA Hall acted in the course and scope of her employment and/or agency relationship with Wellpath and under color of state law.  LNA Hall is sued in her individual capacity.

14.    Defendant Kassie Vanhousen, R.N., is, upon information and belief, presently a resident of Hardy, Virginia.  At all relevant times, RN Vanhousen was employed by Wellpath to provide medical care to the inmates and detainees being held at the Jail.  At all relevant times, RN Vanhousen acted in the course and scope of her employment and/or agency relationship with Wellpath and under color of state law.  RN Vanhousen is sued in her individual capacity.

15.    Defendant Sierra Glenn, L.N.A., is, upon information and belief, presently a resident of Henry County, Virginia.  At all relevant times, LNA Glenn was employed by Wellpath to provide medical care to the inmates and detainees being held at the Jail.  At all relevant times, LNA Glenn acted in the course and scope of her employment and/or agency relationship with Wellpath and under color of state law.  LNA Glenn is sued in her individual capacity.

16.    First Lieutenant Dean Shumate ("Lt. Shumate") is, upon information and belief, presently a resident of Henry County, Virginia.  At all times relevant, Lt. Shumate was a sheriff's deputy employed by the Henry County Sheriff's Office ("HCSO").  At all times alleged herein, Lt. Shumate acted under color of state law, under color of office, and within the scope of his employment with the HCSO.  Lt. Shumate is sued in his individual capacity.

17.    Defendant Lane Perry ("Sheriff Perry") is, upon information and belief, presently a resident of Henry County, Virginia.  At all times relevant, Sheriff Perry was the Sheriff of Henry County, Virginia.  By virtue of his position as Sheriff, Sheriff Perry was the constitutional officer charged with the operation of the HCSO.  Virginia Code § 15.2-1609.  Because Lt. Shumate acted, at all times relevant, within the scope of his employment with the HCSO and under the color of that office, Sheriff Perry is strictly, directly, and vicariously liable for the state law claims asserted herein under the doctrine of *colore officii*.  Sheriff Perry is sued in his individual capacity.

18.    Defendants Eves, C. Adkins, Damron, M. Adkins, Martin, Hall, Vanhousen, and Glenn (the "Provider Defendants") were, at all times relevant, health care providers under Virginia's Medical Malpractice Act ("VMMA"), working as a joint and integrated health care team for Brad as Wellpath providers, and owed all consequent duties under Virginia law to Brad as their patient and otherwise pursuant to the custodial and special relationship shared between the Provider Defendants and Brad.

6

## FACTUAL ALLEGATIONS

19.    Since birth, Brad suffered from a serious medical condition called Congenital Adrenal Hyperplasia (**"CAH"**), which affected his adrenal glands and resulting hormonal stability and caused him to suffer from a "salt wasting" disorder.  As a result, Brad required regular doses (twice daily) of prescribed Prednisone and Fludrocortisone to maintain physiological stability. Without regular and timely doses of these medications according to his treatment plan, which had been prescribed as medically necessary by Brad's primary care provider prior to his incarceration, Brad faced a predictable, progressive, and life-threatening adrenal crisis, followed by death.

20.    On August 2, 2022, beginning around 1:00 p.m., Defendants conducted Wellpath's receiving screening for Brad.  RN C. Adkins performed this intake screening.  Following this screening, RN M. Adkins conducted an initial COWS (Clinical Opiate Withdrawal Scale) assessment.

21.    During the screening, Brad informed Defendants C. Adkins and M. Adkins of his CAH condition and his necessary daily doses of prescribed Prednisone and Fludrocortisone, which Defendants recorded into his Wellpath chart.  By the time of his initial screening by Defendants, Brad had not had these medications since the previous day, August 1, 2022, a fact further documented in his intake screening.  As a result of this intake screening, Wellpath and its employees/agents, including the named Defendants here, received actual knowledge of Brad's serious medical condition and his consequent need for twice-daily dosages of Prednisone and Fludrocortisone.

22.    During this screening, Defendants also recorded that Brad disclosed an opiate addiction and noted the concomitant likelihood of withdrawal.  Defendants further noted Brad's history of depression as well as a prior overdose. The records reflect that these conditions mandated

both regular monitoring and assessments by Defendants, as well as an "urgent" mental health referral.  Brad also informed Defendants of his pertinent prescribing provider and pharmacy— Carilion Clinic (Martinsville) and CVS Stanleytown, respectively—and gave Defendants his authorization for related health information and communications.

23.    Accordingly, no later than Brad's initial screening on August 2, 2022, Defendants had notice of his serious, potentially fatal medical condition requiring a timely, twice-daily dosage of specific, prescribed steroids, as well as complications from his disclosed opiate withdrawal.

24.    On the same afternoon of August 2, 2022, because of concerns about her son's condition, Brad's mother Robin Hensley ("Mrs. Hensley") called the HCADC and spoke with a Wellpath nurse on duty who, upon information and belief, was RN Vanhousen.

25.    During this conversation, Mrs. Hensley informed RN Vanhousen that Brad had Congenital Adrenal Hyperplasia, that the effects of the disease included "salt wasting," and that Brad had to promptly receive his steroid medications or he would go into crisis and die.  Defendant Vanhousen told Mrs. Hensley that Defendants were already aware of Brad's medical condition and that RN Vanhousen had been present during his medical intake.  She further promised Mrs. Hensley that Jail staff would take appropriate measures to procure Brad's prescribed medicine.

26.    In response, Mrs. Hensley asked if Mrs. Hensley could retrieve Brad's medicine directly from CVS or call them to release it to Wellpath, as Brad required the prescribed medicine "today."  RN Vanhousen claimed that Defendants could not use prescribed medicine directly from Brad's pharmacy (which was untrue) and ended the phone call abruptly.

27.    That same day, on August 2, 2022, at 4:57 p.m., PA Eves ordered loperamide 2 mg, with the instruction "give 2 tablet by mouth [n]ow. One time only.  Initial loading dose."  At the

same time, she ordered 1 tablet of 2 mg loperamide by mouth "Detox BID PRN for 7 days," "with each loose stool as needed."

28.     At the same time, PA Eves further ordered meclizine 25 mg, 1 by mouth "Detox TID PRN for 7 days" for symptoms of "nausea / vomiting." However, and notwithstanding their knowledge of Brad's serious medical condition (to include his CAH), Defendants, including PA Eves, took no action to promptly order or acquire Brad's steroid medications on August 2, 2022.

29.     Finally, in the late afternoon of August 3, 2022—more than a full day after Brad had entered the Jail—PA Eves placed an order for Brad's steroid medications.  At this point, Brad had not received his necessary, twice-daily prescription medication for over *two (2)* days—a fact known to Defendants (including PA Eves).

30.     On this same date and approximate time, Defendant Damron recorded an order, read and verified with PA Eves, for "fludrocortisone 0.1 mg tablet: 1 by mouth BID AM & HS for 30 days," and "prednisone 5 mg tablet: give 1 tablet by mouth BID AM & HS for 30 days."

31.     Beginning on Wednesday, August 3, 2022, and continuing into August 4, 2022, Brad repeatedly asked Defendants for help due to severe abdominal pain and discomfort, headache and fever, weakness and fatigue, dehydration due to vomiting and diarrhea, confusion and lightheadedness, loss of appetite, and the other increasing and predictable symptoms of adrenal crisis.

32.     The standard of care for treating a patient with CAH who is experiencing vomiting—particularly after interruptions of the necessary medication schedule—compels emergency hospitalization so that the necessary medication can be administered intravenously. Nonetheless, Defendants failed to seek emergency, life-saving hospitalization for Brad when he began vomiting, or at any time thereafter as he declined further.

9

33.     Moreover, other detainees confirm that Brad entered their pod in obvious distress and became quickly and progressively worse.  For instance, on August 3, 2022, Brad began vomiting, which progressed into vomiting with blood and ultimately defecating on himself with bloody stool.  Moreover, beginning on August 3, 2022, and continuing through the next several days, Brad did not eat and could barely keep fluids down.   Indeed, other detainees had to assist Brad when using the showers because Brad was unable to take a shower under his own power.

34.     On or about August 3, 2022, fellow detainees in Brad's pod became concerned about his obvious and worsening symptoms and condition.  However, despite Brad's (and others') repeated attempts to procure medical attention for Brad, the correctional officers stationed to Brad's housing unit (as well as certain Defendants who were conducting pill pass at the time) did nothing to help him or get him examined, with one presently unknown correctional officer accusing Brad of "faking it."  Brad was not faking the crisis, however, but instead was acutely and obviously sick throughout the day and nights of August 3, 4, and 5, getting more critically ill with advancing, adrenal crisis.

35.     Indeed, during multiple phone calls on Wednesday, August 3, and Thursday, August 4, 2022, Brad informed his mother, Mrs. Hensley, that he was in terrible, worsening physical condition.  He stated that he was very sick, scared, and still did not have his medications.  He further informed her of his symptoms and pain and asked her to help him get his medications from Defendants.

36.      In response to these distressing phone calls, on August 3, 4, and 5, 2022, Mrs. Hensley and Brad's sister repeatedly telephoned Defendants and HCADC staff to alert Defendants, as well as Henry County Sheriff personnel, to the impending, life-threatening crisis that Brad faced should Wellpath officials continue to withhold his prescribed medication and other appropriate

10

care.  All told, Mrs. Hensley and Brad's sister placed at least **18 (eighteen)** phone calls to HCADC during this time.  They left messages for Defendants about Brad's condition and adrenal crisis, his medications, his symptoms, and his need for emergency hospitalization and treatment due to the missed doses of his mandatory medications.  Defendants refused to return their calls and, upon information and belief, simply disregarded their messages, warnings, and concerns about Brad's condition.

37.     On Thursday, August 4, 2022, Defendants had still failed to administer Brad's steroid medications, to have a physician examine him, or to refer him to emergency treatment.  On this date, Mrs. Hensley reached First Lieutenant Dean Shumate ("Lt. Shumate") on the phone. Mrs. Hensley told Lt. Shumate about Brad's medical disorder and that his condition had been worsening.  She reiterated his need for proper medication or, if vomiting, emergency medical treatment so that the medication could be administered intravenously.  Lt. Shumate rebuffed Mrs. Hensley and told her that Brad would get his medication "on night rounds," when Defendants administered medication to detainees.  Mrs. Hensley protested the continued delay and requested that Brad receive his prescribed medication as soon as possible, given that Brad had not received the medication at this point for nearly three days.

38.     Lt. Shumate again declined Mrs. Hensley's request and stated that Brad would have to wait until night rounds to receive his prescribed medication.

39.     Upon information and belief, on Thursday, August 4, 2022, HCADC Sheriff deputies conducted a pod "shake down" search for contraband.  Brad, however, was too ill and weak to get up or stand such that he could leave the pod for the "shake down."   As such, another detainee had to help physically escort Brad toward the exit of his cell.  Once at the door to the cell, Brad slipped down to the floor because he could not stand.  He said, "Man, I'm not going to make

Case 4:24-cv-00014-TTC-CKM    Document 1    Filed 04/12/24    Page 12 of 23
Pageid#: 12

it, I'm going to die in here." He further stated: "I need my medicine." One officer then got a wheelchair for Brad and wheeled him down the hall to Defendants for medical attention. Defendants failed to document this event or any medical encounter that resulted from it.

40.    Subsequently, around 4:45 p.m. on Thursday, August 4, 2022, Plaintiffs discussed Brad's medical condition with a certain Henry County Court judge. During this conversation, Plaintiffs expressed their concerns that Brad was facing an adrenal crisis and impending death if he did not receive emergency medical care.

41.    The judge then telephoned Sgt. Greg Lowery of the Henry County Sherrif's Office and relayed to him this same information regarding Brad's need to urgently receive his medication. Sgt. Lowery then made at least two telephone calls to two different Lieutenants on staff at HCADC, and separately informed both Lieutenants of Brad's potentially fatal medical condition and urgent need for proper medical treatment and medications.

42.    Upon information and belief, these Lieutenants then conveyed these warnings to Defendants Perry and Shumate, whereupon Defendant Shumate indicated that he was already aware of Brad's medical condition and need for medication. However, Lt. Shumate still did not take any appropriate action to address Brad's urgent medical condition and obvious distress.

43.    On August 4, 2022, Brad's steroid medications were still "In Transit From Pharmacy." There is no clear entry in Defendants' records as to when they finally arrived, or whether they were ever successfully administered. Nonetheless, during a phone call with Mrs. Hensley, Brad informed his mother that a certain nurse assistant—believed to be Sierra Glenn, L.N.A.—had attempted to administer an oral dose of the medication to Brad on the evening of August 4, 2022, but that Brad had regurgitated the medication in front of that nurse. Upon information and belief, despite observing Brad's inability to consume his life-saving medication,

12

LNA Glenn made no report of this incident and failed to notify the other Wellpath providers (including PA Eves).

44.     Because Brad was already vomiting by August 3, 2022, and had severely worsened on August 4, it was much too late for oral medications to be reliably ingested for an effective stabilization of his developing adrenal crisis.  When a patient with CAH begins to vomit, the standard of care required (at minimum) that Defendants arrange for the emergency transportation of that patient to a proper medical provider who can evaluate, monitor, and treat that patient to arrest his adrenal crisis and stabilize him with appropriate care, including intravenous medication and hydration.

45.     During the several days that Defendants knowingly deprived Brad of his urgent prescribed medications for a known adrenal disorder and watched him writhe in distress while heading towards foreseeable death, they also ignored the frantic warnings of concerned family members.  Moreover, Defendants did not even consult a physician or perform a proper medical assessment of Brad, regularly monitor or record his signs and symptoms, or arrange for emergency medical attention.

46.     By the morning of August 5, 2022, Defendants likewise did not document his medical condition.  While the Wellpath chart suggests someone attempted to administer his oral prescription steroid medication, it was much too late for this to arrest his adrenal crisis, even if Brad was able to swallow it.

47.     On August 5, 2022, Mrs. Hensley and Brad's sister again called HCADC.  The family spoke with both Lt. Dean Shumate and Lt. Homer Jessee, and informed them of their fear that Brad would die from adrenal crisis and that he needed immediate, emergency hospitalization

where he could receive his prescribed medication intravenously.  Lt. Jessee assured Brad's family he would immediately go speak with Wellpath personnel about Brad's situation.

48.    On August 5, 2022, at **6:39 p.m.**, RN M. Adkins submitted an entry on Brad's medical file that at an unrecorded time previously that day, a deputy from Pod M called Defendants to report that Brad was "throwing up blood."  In response, LNA Hall and the deputy brought Brad to the medical unit.  RN M. Adkins recorded that it was somehow "found" that Brad was spitting up a red drink—as opposed to blood.  RN M. Adkins notes that she "called provider to notify her of the situation."

49.    This unnamed "provider"—who, upon information and belief is PA Eves—then advised RN M. Adkins to bolus a bag of normal saline, which RN M. Adkins administered along with three cups of Gatorade.  She recorded a blood pressure of 104/68, a heart rate of 107 beats per minute ("bpm"), and then sent Brad back to his pod in a wheelchair.

50.    More troubling, after the event in which Brad was "throwing up blood," RN M. Adkins recorded a separate encounter on August 5, 2022, at approximately **5:00 p.m.**  Specifically, RN Adkins went to Brad's pod to do a "detox assessment" and administer PRN medications.  She recorded "Patient states that he is still vomiting.  Administered Meclizine.  Notified provider." Accordingly, RN M. Adkins was aware that Brad was complaining of continuous vomiting throughout August 5, 2022.

51.    Aside from ordering some saline and Gatorade, the referenced "provider" (who, upon information and belief, is PA Eves) did not take any action to procure Brad emergency medical treatment in response to Brad vomiting into the evening of August 5, 2022.

52.    On August 5, 2022, at approximately 10:05 p.m., Defendant LNA Martin entered a "Refusal of Medications/Missed Medications" form on Brad's medical file—indicating that Brad

"refused" a dose of his steroid medications at this time. However, given Brad's medical conditions and symptoms, including ongoing, involuntary vomiting for days, any "refusal" reflected that Brad was so acutely ill that he could neither take nor retain the medicine orally, and it was no longer an appropriate treatment for his acute condition in any event. Brad did not sign this form.

53.    Despite Brad's obvious, acute distress and crisis and obvious inability to take, retain, or use the oral medication, LNA Martin and the Defendants still did not seek any additional treatment for Brad, nor did they consult nor notify PA Eves or another, appropriate provider of Brad's condition, nor seek any emergency treatment or examination.

54.    Subsequently, Defendant LPN Damron recorded in Brad's Wellpath chart that on August 6, 2022, she took basic assessments of Brad's vitals and condition (which she rated as being within the "Mild" range) at 3:09 a.m. and 6:14 a.m. respectively.

55.    Upon information and belief, these assessments never occurred. Instead, LPN Damron neglected to perform these assessments—continuing Defendants' pattern of breaches of Brad's protocol, proper treatment and needs—and she then manufactured these entries in Brad's medical file.

56.    Upon information and belief, early in the morning of August 6, 2022, the date Brad died, Deputy Anthony Altizer observed Brad while conducting twice-hourly rounds, and saw Brad in obvious distress. Specifically, Brad was having trouble breathing. In response, Deputy Altizer called the medical unit and spoke with a nurse believed to be Defendant Damron, telling her that a detainee was having breathing problems. LPN Damron asked, "Is that Hensley?"

57.    In response to the deputy's report, LPN Damron decided not to respond to Brad. Instead, she chose to leave HCADC since she was close to the end of her duty shift, and said that she would pass the information on when the next nurse came on duty.

58.     Deputy Altizer did another round in the pod and returned to Brad.  Brad was still having breathing problems, and Defendants had not taken any action (to include RN Damron, who had received the report that morning that Brad was struggling to breathe).  The deputy called the medical unit again and spoke to another deputy to advise him that Brad was still in distress and that they needed to respond.  Deputy Altizer then went back to Brad and found him unresponsive. The deputy initiated C.P.R. at approximately 7:33 a.m.

59.     Brad's Wellpath chart contains a record dated August 6, 2022, at 7:31 p.m. (12 hours post-death) by Defendant RN M. Adkins stating that at approximately 7:30 a.m., a deputy called to state that Brad was having shallow breathing and that "we needed to get down there." RN M. Adkins and another deputy took the vitals machine and "crash bag," and went to check on him.  The deputies then began administering C.P.R. and ultimately carried Brad out of the pod to the hallway, where the C.P.R. continued.  They attempted to use an A.E.D. and Ampu-bag at 7:37 a.m.  They continued C.P.R. until EMS arrived at 7:46 a.m., at which point EMS took over C.P.R. and started an I.V. with a round of Epi at 7:59 a.m.  Brad died at the HCADC.

60.     According to the coroner's report, at approximately 8:02 a.m., August 6, 2022, Brad was pronounced deceased.

61.     A subsequent autopsy report by the Office of the Chief Medical examiner resulted in pathological diagnoses including:  "1. Acute fentanyl toxicity. 2. Clinical history of congenital adrenal hyperplasia. a. Severe inflammation and cortical atrophy of the adrenal glands. b. Thyroid atrophy with mild chronic inflammation. C. Severe hyponatremia (sodium 117 mmol/L)."  The examiner attributed cause of death to: "Acute fentanyl toxicity with adrenal crisis due to congenital adrenal hyperplasia contributing."

62.    Unlike most other deaths in the jail, Henry County Sheriff Lane Perry chose to have his own deputies investigate Brad's death internally, without referring it to the Virginia State Police, even though multiple deputies from that office were material witnesses and participants in the events at issue.  The supervising investigator on the resulting investigation was Wayne Davis, now Henry County Sheriff.

63.    Had Defendants met the standards of care or acted without deliberate indifference, and provided Brad adequate medical care, supervision, or response to his health conditions and repeated notices of acute decline, Brad would not have suffered and died.

## COUNT I
### State Law Negligence/Gross Negligence/Willful and Wanton Negligence/Wrongful Death
### (All Defendants)

64.    Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

65.    The Provider Defendants were Brad's healthcare providers under the Virginia Medical Malpractice Act and, at all times relevant, were acting within the course and scope of their employment/agency relationship with Wellpath.  As such, the Provider Defendants owed Brad a duty to exercise reasonable care in the evaluation and treatment of his CAH, to manage all aspects of his treatment plan, and to monitor, diagnose, and treat his symptoms and conditions according to the standard of care set forth in Virginia Code § 8.01-581.20.[1]

66.    Moreover, Lt. Shumate owed Brad a duty to exercise reasonable care in following up on the numerous reports he had received regarding Brad's medical condition and ensuring that Brad either received his medication or was transported to a hospital.

---

[1]    To the extent that any of these named Defendants were not medical providers within the meaning of the VMMA, this Count proceeds against any such Defendant under a common law negligence theory.

17

67.    Alternatively, all Defendants assumed such duties to Brad by virtue of the special and custodial relationship shared between Brad and Defendants and which obligated them to render or make available legally adequate medical care to the detainees of the Jail, including Brad.

68.    Moreover, because Lt. Shumate acted, at all times relevant, within the scope of his employment with the HCSO and under the color of that office, Sheriff Perry is strictly, directly, and vicariously liable for Lt. Shumate's acts under the doctrine of *colore officii*.

69.    Specifically, the actions undertaken by Lt. Shumate were unauthorized by his position, but nonetheless done in a form purporting official duty. Indeed, Lt. Shumate is not authorized to ignore and disregard an inmate's extreme and obvious medical distress. And, Lt. Shumate would only have the opportunity and authority to commit the tortious conduct set forth herein by virtue of his position as a sheriff's deputy.

70.    Wellpath also had duties to provide, among other things, medical determinations by Wellpath physicians that were "fit for confinement," as well as a legitimate health assessment beyond a receiving screening for Brad, "as soon as possible" after Brad's arrival at HCADC.

71.    Nonetheless, Defendants never performed the required fit-for-confinement determinations or health assessments, or had a single physician or physician extender (such as a Physician's Assistant) assess or examine Brad remotely or in-person, even after he became acutely and visibly ill. Defendants never took a complete and proper history, never established or undertook a proper observation, management, or assessment program to monitor his conditions, and never developed or executed a proper treatment plan. Defendants never contacted nor consulted his disclosed community providers, nor referred or transported him to any other providers, even as he displayed signs and symptoms of acute, life-threatening distress.

72.     Defendants each breached their standards of care and duties owed to Brad and were otherwise negligent while acting in the course and scope of their employment, agency, and service to Wellpath and/or the HCSO by, among other things: (i) failing to properly and timely order, plan, obtain and administer Brad's prescribed medications; (ii) misdiagnosing and repeatedly failing to assess, monitor, evaluate and respond to Brad's signs, symptoms and conditions, including acute worsening illness due to adrenal crisis, or to consult with or arrange for such diagnosis and competent care by other providers; (iii) failing to implement proper orders or protocols to ensure that Brad received appropriate care; (iv) failing to chart, communicate or document Brad's care, including his complaints, signs and symptoms; (v) disregarding the multiple daily instructions, warnings, and notices of Brad's illness and demands for proper medical care from multiple sources, and opportunities to save his life over four days; and (vi) denying Brad necessary emergency medical care, hospitalization, and other treatment according to the applicable standards of care.

73.     Because these breaches of the standard of care occurred while the Provider Defendants were acting within the course and scope of their employment with Wellpath, Wellpath is vicariously liable for the damages proximately caused by those breaches of the standard of care.

74.     Moreover, to the extent that any presently unknown employee/agent or provider of Wellpath observed Brad's medical condition between August 3, 2022 - August 6, 2022, yet failed to respond in accordance with the applicable standards of care set forth herein, Wellpath is vicariously liable for the state law claims asserted herein under the doctrine of *respondeat superior*.

75.     As a direct and proximate cause of the breaches of the standards of care and other duties articulated in this Count and described otherwise in the Complaint, Brad's illness worsened and caused him to die at the HCADC.

76.     As a direct and proximate result of the negligence, gross negligence, and willful and wanton negligence set forth herein, the statutory beneficiaries of Brad have suffered consequential damages under Code § 8.01-52, including sorrow, mental anguish, and solace, including but not limited to the losses of Brad's comfort, guidance, companionship, kindly offices, society, and advice; loss of services, protection, care and assistance; and reasonable funeral expenses.

77.     Defendants were also grossly negligent in that their actions and omissions showed such a level of indifference to Brad that they display an utter disregard of prudence, amounting to a complete neglect for his safety. Additionally, as to each individual Defendant, his/her several acts of negligence, when combined, had the cumulative effect of showing a reckless or total disregard for Brad.

78.     The actions of one or more of the Defendants constitute willful or wanton conduct, and such recklessness evinces a conscious disregard for Brad's safety.  As a result, one or more of the Defendants is liable for punitive damages.

## COUNT II
### 42 U.S.C. § 1983—Fourteenth Amendment Violation
### (Provider Defendants; Lt. Shumate)

79.     Plaintiffs reallege and incorporate by reference the allegations contained in the previous paragraphs.

80.     As a pretrial detainee being housed at the HCADC, Brad had a right under the Fourteenth Amendment to adequate, safe, secure, and humane conditions of detention and confinement, including constitutionally adequate medical care for his objectively serious medical needs.[2]

---

[2]     In the alternative, to the extent Hensley was an inmate rather than a pretrial detainee, this right would have been afforded to him by the Eighth Amendment.

81.     By virtue of Wellpath's contract with Henry County, the Provider Defendants acted under color of state law in performing their medical duties to Brad.

82.     Brad's disclosed medical condition of Congenital Adrenal Hyperplasia constituted an objectively serious medical need.  Indeed, it had been diagnosed by a physician as requiring treatment and, when left untreated, rendered Brad sufficiently ill that any lay person would have recognized the obvious need for medical intervention on his behalf.

83.     Defendants were subjectively and objectively aware of Brad's needs to receive frequent monitoring, health assessments by physicians or physician extenders, and sufficient charting of those results.  They were further aware of the risks of severe harm that any delay in identifying and treating Brad would pose to him, to include a substantial risk of permanent injury and/or death.  Finally, they were aware that the policies and protocols of Wellpath and HCADC required them to provide an urgent mental health referral; have a physician or physician extender conduct a full health assessment; to regularly conduct health assessments of Hensley and to document his condition; to promptly and correctly administer his prescription steroid medications; and to send him to a community provider for emergency medical care as he became acutely sick with adrenal crisis and other conditions.  Moreover, each of the Defendants became personally aware of Brad's CAH and consequent need for medical treatment either through his intake screening (which was documented in his medical file and to which all Wellpath healthcare providers had access) or through the many complaints and reports submitted by Brad, other inmates, and Brad's family members.

84.     Notwithstanding the foregoing, Defendants exhibited deliberate indifference to Brad by, among other things:  denying Brad regular or appropriate assessments or medical examinations; ignoring and failing to record his medical condition; ignoring his obvious signs and

symptoms of adrenal crisis; failing to respond to his objective need for care, failing to timely procure or administer his medications, and failing to timely send him to a hospital for emergency medical treatment.

85.    Defendants were aware of Brad's history, diagnosis, and prescriptions, as well as his developing illness and complaints, signs and symptoms.  They were aware of the need to regularly monitor and properly assess Brad to identify his decompensation and illness and to take appropriate and timely action to prevent adrenal crisis, stop it and ensure it did not get worse, and to take life-saving interventions and arrange for appropriate, emergent hospital care.  The Provider Defendants were further aware that failing to timely respond to or treat Brad's clinical conditions would place him at increased risk for serious injury and/or death.

86.    Notwithstanding that actual knowledge, Defendants exhibited deliberate indifference to Hensley's objectively serious medical need in choosing not to properly assess, monitor, respond, refer, treat or otherwise care for Brad after August 2, 2022.

87.    As a direct and proximate cause of the unconstitutional conduct articulated herein, Brad Hensley suffered severe pre-death pain and suffering (physical and mental) and died from the effects of his mistreatment and his worsening illnesses and a preventable exposure to fentanyl as he suffered with adrenal crisis.  The beneficiaries of his estate have also suffered mental and emotional distress and will continue to suffer emotional distress in the future as a direct and proximate result of Defendants' unconstitutional conduct.

88.    Defendants' aforesaid deliberate indifference, actions and omissions constitute a willful, wanton, reckless, and conscious disregard of Brad's constitutional rights, by reason of which Plaintiffs claim punitive damages.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs demand judgment against Defendants, jointly and severally, for

compensatory damages in an amount to be determined at trial, plus interest, together with punitive

damages in an amount to be determined at trial, and their attorney fees and costs expended in this

action pursuant to 42 U.S.C. § 1988.

**A TRIAL BY JURY IS DEMANDED.**

Respectfully submitted,
ROBERT and ROBIN HENSLEY, as
Administrators of the Estate of
BRAD S. HENSLEY,

By: /s/ *Devon J. Munro*
Devon J. Munro (VSB No. 47833)
Benjamin Byrd (VSB No. 76560)
**Munro Byrd, P.C.**
120 Day Ave. SW, Suite 100
Roanoke VA 24016
T: (540) 283-9343
F: (540) 328-9290
dmunro@trialsva.com
byrd@trialsva.com

Jonathan E. Halperin (VSB No. 32698)
Darrell Getman (VSB No. 95791))
**Halperin Law Center, LLC**
4435 Waterfront Drive, Suite 100
Glen Allen, VA 23060
T: (804) 527-0100
F: (804) 597-0209
jonathan@hlc.law
darrell@hlc.law

*Counsel for Plaintiffs*