IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
DANVILLE DIVISION

CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED
8/6/2024
LAURA A. AUSTIN, CLERK
BY: s/ Christel Kemp
        DEPUTY CLERK

| | |
|---|---|
| ROBERT HENSLEY & ROBIN HENSLEY, *as Co-Administrators of the Estate of Brad S. Hensley, deceased*, | ) ) ) ) ) |
| Plaintiffs, | ) Civil Action No. 4:24-cv-00014 |
| v. | ) **MEMORANDUM OPINION** ) |
| WELLPATH, LLC, *et al.*, | ) By: Hon. Thomas T. Cullen ) United States District Judge |
| Defendants. | ) |

On August 6, 2022, Brad S. Hensley ("Brad") died at Henry County Adult Detention Center (the "Jail"). Robert Hensley and Robin Hensley ("Plaintiffs")—Brad's parents and co-administrators of his estate—subsequently sued Defendant Wellpath, LLC ("Wellpath"), a company that provided medical services at the Jail, and numerous individuals, including several Wellpath employees: Defendants Christopher Adkins, RN ("C. Adkins"); Megan Adkins, RN ("M. Adkins"); Raven Martin, LNA; Jacqueline Hall, LNA; Kassie Vanhousen, RN; and Sierra Glenn, LNA (collectively, "Individual Providers"), along with Sarah Eves, PA, and Deborah Damron, LPN.[1] Plaintiffs' complaint sets forth claims of negligence and deliberate indifference, based on Defendants' alleged mistreatment of Brad as a pretrial detainee.

---

[1] Lane Perry, the former sheriff of Henry County, Virginia ("Sheriff Perry"), and Dean Shumate, a deputy sheriff ("Lt. Shumate" and, collectively with Wellpath, Individual Providers, Eves, Damron, and Sheriff Perry, "Defendants") are also defendants in this case, but they have yet to file a responsive pleading.

The matter is now before the court on two motions to dismiss for failure to state a claim: one filed by Wellpath and Individual Providers, and one filed by Damron. The court will deny both motions.

## I. STATEMENT OF FACTS

The following facts are taken from Plaintiffs' complaint and, at this stage, are presumed true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

On August 2, 2022, Brad entered the Jail as a pretrial detainee. (Compl. ¶ 1 [ECF No. 1].) That afternoon, Brad participated in Wellpath's intake screening with RN C. Adkins and underwent a Clinical Opiate Withdrawal Scale assessment with RN M. Adkins. (*Id.* ¶ 20.) During those meetings, Brad informed both nurses that he suffered from Congenital Adrenal Hyperplasia ("CAH") and needed twice daily doses of his prescribed Prednisone and Fludrocortisone. (*Id.* ¶¶ 19, 21.) Brad also shared his prescribing provider's and pharmacy's information and authorized Defendants to communicate with them. (*Id.* ¶ 22.)

Brad's medical chart at the Jail noted his CAH and required prescriptions. (*Id.* ¶ 21.) The chart also indicated that Brad had not received his prescriptions since August 1, likely would experience opiate withdrawal due to an addiction, and had a history of depression. (*Id.* ¶¶ 21–22.) According to the Jail's records, Brad needed to receive regular monitoring and assessments. (*Id.* ¶ 22.)

The same day, Brad's mother called the Jail to discuss her son's condition. (*Id.* ¶¶ 24–25.) She spoke to RN Vanhousen about Brad's CAH and informed the nurse that Brad needed his medications promptly "or he would go into crisis and die." (*Id.* ¶ 25.) Vanhousen was present during Brad's initial medical screenings and assured his mother that Defendants were

aware of Brad's conditions and would get his prescriptions. (*Id.*) Brad's mother offered to drop the medicine off herself or have Brad's prescribing provider release it to Wellpath, but Vanhousen informed her that neither of those things were allowed. (*Id.* ¶ 26.)

No Defendant ordered Brad's prescriptions on August 2. PA Eves requested other medicines for Brad that day but did not order his CAH prescriptions until late in the afternoon on August 3. (*Id.* ¶¶ 27–29.) By that point, Brad had gone more than two days without receiving his life-sustaining medication. (*Id.* ¶ 29.)

Brad's condition began to noticeably worsen on August 3. He experienced "severe abdominal pain and discomfort, headache and fever, weakness and fatigue, dehydration due to vomiting and diarrhea, confusion and lightheadedness, loss of appetite, and the other increasing and predictable symptoms of adrenal crisis." (*Id.* ¶ 31.) To other Jail detainees, Brad was in "obvious distress" and rapidly deteriorating. (*Id.* ¶ 33.) He was vomiting and defecating blood, and other detainees had to help him use the shower because he could not do so under his own power. (*Id.*) The other detainees were so concerned about Brad's condition that they alerted correctional officers and certain Defendants that he needed medical care. (*Id.* ¶ 34.) But Defendants apparently ignored these concerns, along with Brad's repeated pleas for help, and one correctional officer accused Brad of "faking it." (*Id.* ¶¶ 31, 34.)

Brad told his mother about his condition during phone calls on August 3 and 4 and asked her to help get his medications. (*Id.* ¶ 35.) Brad's mother and sister subsequently called, and left messages for, Defendants and other Jail staff at least *18* times from August 3–5 to inform them about Brad's health crisis, prescription medication, and need for emergency hospitalization due to his missed doses. (*Id.* ¶ 36.) According to Plaintiffs, however,

Defendants "simply disregarded" these calls or rebuffed their concerns, prompting Plaintiffs to discuss the situation with a Henry County judge. (*Id.* ¶¶ 36–38, 40.) The judge then called a sergeant at the Henry County Sheriff's office to relay Plaintiffs' concerns, and the sergeant, in turn, called lieutenants at the Jail to notify them of "Brad's potentially fatal medical condition and urgent need for proper medical treatment and medications." (*Id.* ¶ 41.) The lieutenants conveyed these warning to Lt. Shumate and Sheriff Perry; Lt. Shumate allegedly indicated that he was aware of Brad's condition, but he did not take any action to address it. (*Id.* ¶ 42.)

On August 4, Jail officers conducted a pod shake-down in search of contraband. (*Id.* ¶ 39.) Another detainee tried to help Brad leave his cell during this search because he was too weak to stand on his own, but Brad collapsed at his cell door. (*Id.*) While on the floor, Brad said he was "going to die" and "need[ed] [his] medicine," which prompted an officer to get him a wheelchair and take him to Defendants for medical attention. (*Id.*) Defendants supposedly did not document this event in Brad's medical chart. (*Id.*)

That evening, Defendants first attempted to give Brad his prescriptions when LNA Glenn provided him an oral dose. (*Id.* ¶ 43.) Brad, however, regurgitated the medication due to his deteriorating state. (*Id.*) Glenn purportedly observed Brad spit up the medicine but did not report the incident or try to help him further. (*Id.*) The next morning, on August 5, Defendants again tried to give Brad an oral dose of his prescriptions. (*Id.* ¶ 46.) But it was allegedly too late for oral doses by that point; Brad needed emergency care and intravenous treatment. (*Id.* ¶¶ 44–46.)

Brad's condition continued to worsen throughout the day. After a deputy reported that Brad was throwing up blood, he was transported back to the Jail's medical unit by the deputy

and LNA Hall. (*Id.* ¶ 48.) At the medical unit, RN M. Adkins recorded something different: she noted that Brad was spitting up a red drink, not blood, even though Brad had separately told her that day about his continuous vomiting. (*Id.* ¶¶ 48, 50.) M. Adkins then supposedly gave Brad saline, based on PA Eves's advice, and Gatorade. (*Id.* ¶ 49.) She also measured his blood pressure and heart rate before sending him back to his cell in a wheelchair. (*Id.*) Later, around 10:00 p.m., LNA Martin indicated that Brad "refused" his prescriptions. (*Id.* ¶ 52.) Plaintiffs assert that any "refusal" was involuntary given that Brad was so ill he could not take or retain the medicine orally. (*Id.*) Indeed, Brad did not sign a form saying he refused his medications. (*Id.*)

On August 6, LPN Damron allegedly falsified records in Brad's medical chart when she wrote that she assessed his vitals and condition around 3:00 a.m. and 6:00 a.m.; Plaintiffs claim she never performed those assessments. (*Id.* ¶¶ 54–55.) A deputy also supposedly told Damron early in the morning that Brad was in obvious distress and having trouble breathing. (*Id.* ¶ 56.) Damron, however, did not help Brad—instead, she left the Jail because she was close to the end of her shift. (*Id.* ¶ 57.)

The deputy who spoke to Damron called the medical unit again around 7:30 a.m. to relay that Brad remained in distress. (*Id.* ¶ 58.) Upon returning to Brad's cell shortly thereafter, the deputy found Brad unresponsive and began performing CPR. (*Id.*) RN M. Adkins responded with another deputy a few minutes later and continued administering CPR to Brad until emergency medical services ("EMS") arrived. (*Id.* ¶ 59.) Tragically, EMS could not save Brad, and he died in the Jail shortly after 8:00 a.m. (*Id.* ¶ 60.) The coroner stated that Brad's

cause of death was due to "[a]cute fentanyl toxicity with adrenal crisis due to congenital adrenal hyperplasia contributing." (*Id.* ¶ 61.)

In April 2024, Plaintiffs filed the present action in this court, asserting claims for simple, gross, and willful and wanton negligence leading to Brad's wrongful death against all Defendants (Count I), and a claim for deliberate indifference in violation of the Fourteenth Amendment, under 42 U.S.C. § 1983, against Individual Providers, Eves, Damron, and Lt. Shumate (Count II). Wellpath and Individual Providers filed their motion to dismiss for failure to state a claim on May 28, 2024 (ECF No. 11), and Damron filed a separate motion to dismiss under Rule 12(b)(6) on June 27 (ECF No. 30). The motions are now fully briefed and ripe for decision.[2]

## II.   STANDARD OF REVIEW

Motions to dismiss under Rule 12(b)(6) test the legal sufficiency of a complaint. *Edwards v. City of Goldsboro*, 178 F.3d 231, 243 (4th Cir. 1999). To survive a Rule 12(b)(6) motion, the complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible when the plaintiff's allegations "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* While a complaint does not need "detailed factual allegations," complaints merely offering "labels and conclusions," "'naked assertion[s]' devoid of 'further factual enhancement,'" or "a formulaic recitation of the elements of a cause of action will not do." *Id.* (alteration in original) (quoting *Twombly*, 550 U.S. at 555, 557). Overall, the court must "accept as true the well-pled

---

[2] The court dispenses with oral argument because it would not aid in the decisional process.

allegations of the complaint and construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." *Harbourt v. PPE Casino Resorts Md., LLC*, 820 F.3d 655, 658 (4th Cir. 2016).

### III.  ANALYSIS

For the following reasons, Individual Providers', Damron's, and Wellpath's arguments do not persuade the court to dismiss any of Plaintiffs' claims at this stage.[3]

### A. Individual Providers and Damron

Plaintiffs pleaded facts to state claims for deliberate indifference and simple, gross, and willful and wanton negligence against Individual Providers and Damron, so those causes of action will survive.

#### 1. Deliberate Indifference

The Fourteenth Amendment's Due Process Clause guarantees a pretrial detainee "adequate medical care and freedom from deliberate indifference to his serious medical needs." *Tarashuk v. Givens*, 53 F.4th 154, 164 (4th Cir. 2022). To state a claim for deliberate indifference to a medical need under 42 U.S.C. § 1983,[4] a plaintiff must plead four elements:

> (1) [the detainee] had a medical condition or injury that posed a substantial risk of serious harm; (2) the defendant intentionally, knowingly, or recklessly acted or failed to act to appropriately address the risk that the condition posed; (3) the defendant knew or should have known (a) that the detainee had that condition

---

[3] Wellpath and Individual Providers state that they also move to dismiss "[p]ursuant to Rule . . . 12(f)." (Wellpath & Individual Providers Mot. Dismiss at 1 [ECF No. 11]; Wellpath Supp. Br. at 1 [ECF No. 12]; Individual Providers Supp. Br. at 1 [ECF No. 13].) Apart from that statement, however, they do not discuss Rule 12(f)—which is for motions to strike, not motions to dismiss—in their filings. The court, therefore, denies their motion under Rule 12(f).

[4] The parties do not dispute that Individual Providers and Damron were acting under color of state law because they were providing medical services to pretrial detainees at the Jail. *See, e.g.*, *Conner v. Donnelly*, 42 F.3d 220, 224–25 (4th Cir. 1994).

> and (b) that the defendant's action or inaction posed an unjustifiably high risk of harm; and (4) as a result, the detainee was harmed.

*Short v. Hartman*, 87 F.4th 593, 611 (4th Cir. 2023). As the Fourth Circuit explained, this test does not include a subjective prong:

> The objective test we adopt today differs from our prior subjective test in one respect only. The plaintiff no longer has to show that the defendant had actual knowledge of the detainee's serious medical condition and consciously disregarded the risk that their action or failure to act would result in harm. That showing remains sufficient, but it is no longer necessary. Now, it is sufficient that the plaintiff show that the defendant's action or inaction was . . . objectively unreasonable: that is, the plaintiff must show that the defendant should have known of that condition and that risk, and acted accordingly. Or as the Supreme Court put it . . ., it is enough that the plaintiff show that the defendant acted or failed to act in the face of an unjustifiably high risk of harm that is either known or so obvious that it should be known.

*Id.* (internal citations and quotations omitted).

For the first element, a medical condition is "serious if it is diagnosed by a physician as mandating treatment or is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Id.* at 612 (cleaned up). Plaintiffs satisfy this element by alleging that a doctor treated Brad's CAH outside of the Jail and that Brad would suffer serious harm, and eventually die, if he did not receive his prescriptions to treat the condition. (Compl. ¶ 19.) Plaintiffs also fulfill this element by pleading facts to support that Brad's need for medical care was so obvious that even the Jail's guards and other detainees easily recognized it. (*See id.* ¶¶ 33–34, 39, 48, 56–58.)

Plaintiffs' allegations satisfy the second element because the complaint is replete with facts that allege that each Individual Provider and Damron—despite knowing of Brad's

situation, as discussed below—intentionally or, at a minimum, recklessly failed to provide Brad his prescriptions or other appropriate medical care to address his CAH crisis.

On the third element, the complaint alleges that each individual had specific knowledge of Brad's CAH and deteriorating condition while he was at the Jail. The complaint states that C. Adkins and M. Adkins knew of Brad's CAH and attendant need for treatment since August 2, 2022, because Brad shared this information with them during his intake screenings; they also allegedly recorded that information in Brad's medical file. (*Id.* ¶¶ 20–21.) Vanhousen purportedly learned the information the same day because she was present during Brad's intake and communicated to Brad's mother that she and the other Defendants knew about his condition. (*Id.* ¶ 25.) Glenn and Martin knew of Brad's illness from at least when they attempted to give Brad his required medications, which he was unable to keep down due to his worsening condition. (*Id.* ¶¶ 43, 52.) Hall was aware of Brad's precarious state as well because she transported him to the medical unit when he was throwing up blood on August 5. (*Id.* ¶ 48.) And Damron knew about Brad's crisis because she had access to Brad's medical chart—in which she supposedly falsified giving Brad two assessments—and because a deputy told her that Brad was in distress and having trouble breathing shortly before Damron left work and Brad died on August 6. (*Id.* ¶¶ 54–57.) The reasonable inference that each Individual Provider and Damron knew of Brad's status and need for care is bolstered by the allegations that they worked as part of a "joint and integrated health care team" at the Jail responsible for Brad's medical needs and received *18* phone calls from Brad's family about his CAH and need for emergency hospitalization. (*Id.* ¶¶ 18, 36.)

Next, the complaint alleges that each Individual Provider and Damron knew or should have known that their inaction posed an unjustifiably high risk of harm to Brad. According to Plaintiffs, Brad's suffering and need for medical care was so obvious that laymen at the Jail—correctional officers and other detainees—alerted Defendants about it on multiple occasions. (*See id.* ¶¶ 33–34, 39, 48, 56–58.) Additionally, Plaintiffs assert that each Individual Provider and Damron was a Wellpath employee and knew or should have known that the company's protocols required them to regularly monitor Brad, ensure he promptly received his prescriptions, and provide him with emergency medical care when he became acutely sick. (*Id.* ¶¶ 1, 9, 11–15, 55, 83.) Individual Providers' and Damron's failure to follow these protocols further demonstrates that their purported inaction exposed Brad to an excessive risk of harm. *See Short*, 87 F.4th at 613 (cleaned up) ("[P]rotocol violations demonstrate that a defendant knew of and disregarded a substantial risk of serious injury to the detainee or that they actually knew of and ignored a detainee's serious need for medical care."). Accepting all of these allegations as true, as the court must, Plaintiffs satisfy the third element that Individual Providers and Damron knew or should have known that Brad had CAH and would suffer serious harm due to their inaction.

Lastly, the complaint fulfills the fourth element because it contends that Individual Providers' and Damron's inaction resulted in Brad's death. (Compl. ¶¶ 60–61.)

In sum, the complaint's allegations easily allow the court to draw the reasonable inference that each Individual Provider and Damron "failed to act 'in the face of an unjustifiably high risk of harm that [was] either known or so obvious that it should [have been]

known.'" *See Short*, 87 F.4th at 611 (quoting *Farmer v. Brennan*, 511 U.S. 825, 836 (1994)). Accordingly, Plaintiffs' deliberate indifference claim passes muster at this stage.

### 2. Negligence

Plaintiffs also state claims for simple, gross, and willful and wanton negligence under Virginia law.[5] "To succeed on a negligence claim, a plaintiff must demonstrate 'the existence of a legal duty, a breach of the duty, and proximate causation resulting in damage.'"[6] *Riddick v. Watson*, 503 F. Supp. 3d 399, 424–25 (E.D. Va. 2020) (quoting *Atrium Unit Owners Ass'n v. King*, 585 S.E.2d 545, 548 (Va. 2003)).

Here, the complaint states negligence claims against Individual Providers and Damron. Plaintiffs allege that Brad was a pretrial detainee at the Jail where Individual Providers and Damron were his medical providers and custodians. As such, Individual Providers and Damron had a duty to provide Brad adequate medical care. *See, e.g.*, *Patterson v. City of Danville*, 875 S.E.2d 65, 68 (2022) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). Plaintiffs pleaded facts throughout the complaint that Individual Providers and Damron breached that duty by not giving Brad his required CAH prescriptions or appropriate medical treatment once he

---

[5] As a federal court exercising supplemental jurisdiction over Plaintiffs' state law claims, the court must apply the choice-of-law rules of the state in which it sits—Virginia. *See Atl. Specialty Ins. Co. v. Bindea*, 656 F. Supp. 3d 624, 638 (W.D. Va. 2023). With respect to tort claims, Virginia's choice-of-law rules dictate that "the law of the place of the wrong" (*lex loci delicti*) supplies the substantive law to those claims. *Milton v. IIT Rsch. Inst.*, 138 F.3d 519, 521 (4th Cir. 1998); *see, e.g.*, *Jones v. R.S. Jones & Assocs., Inc.*, 431 S.E.2d 33, 34 (Va. 1993). Because Defendants purportedly harmed Brad at the Jail in Henry County, Virginia, Plaintiffs' negligence claims are governed by Virginia law.

[6] Whether or not the Virginia Medical Malpractice Act ("VMMA") applies to claims against certain Individual Providers and Damron does not affect whether Plaintiffs set forth negligence causes of action against them. *See Caruth v. Clark*, No. 1:16-cv-149, 2017 WL 1363314, at *7 (E.D. Va. Apr. 12, 2017) (cleaned up) ("The VMMA provides a set of rules that govern malpractice claims; it does not determine 'when the patient has a cause of action—an entirely separate issue.'" (quoting *Simpson v. Roberts*, 752 S.E.2d 801, 806 (Va. 2014) (McClanahan, J., concurring))).

became ill. And Plaintiffs claim that Individual Providers' and Damron's breach of their duty was the proximate cause of Brad's death. The basic elements of a negligence claim are therefore satisfied.

The court next evaluates whether Plaintiffs' allegations meet the standards for gross negligence and/or willful and wanton negligence.

> [G]ross negligence[] is a degree of negligence showing indifference to another and an utter disregard of prudence that amounts to a complete neglect of the safety of such other person. This requires a degree of negligence that would shock fair-minded persons, although demonstrating something less than willful recklessness. . . . [W]illful and wanton negligence . . . is defined as acting consciously in disregard of another person's rights or acting with reckless indifference to the consequences, with the defendant aware, from his knowledge of existing circumstances and conditions, that his conduct probably would cause injury to another.

*Riddick*, 503 F. Supp. 3d at 425 (quoting *Cowan v. Hospice Support Care, Inc.*, 603 S.E.2d 916, 918–19 (Va. 2004)).

As discussed in connection with Plaintiffs' deliberate indifference claim, the complaint alleges facts that each Individual Provider and Damron knew of the need to manage Brad's CAH and of his acute suffering from not receiving his necessary treatment. The complaint further states that Brad's suffering and need for care was obvious even to correctional officers and detainees who were not part of the medical team. According to Plaintiffs, however, no Individual Provider or Damron attempted to give Brad even remotely adequate treatment, which resulted in him suffering and eventually dying less than five days after he arrived at the Jail.

Viewing those facts in the light most favorable to Plaintiffs, the court has no trouble finding that the complaint sufficiently alleges Individual Providers and Damron either consciously disregarded Brad's right to adequate medical treatment or were recklessly indifferent about their inaction, and that such inaction injured Brad.[7] Plaintiffs, therefore, state a claim for willful and wanton negligence, and necessarily also state a claim for the lesser degree of gross negligence. *Cf. Kuykendall v. Young Life*, 261 F. App'x 480, 491 (4th Cir. 2008) ("Because [the plaintiff] cannot prove gross negligence, he cannot as a matter of law prove willful and wanton negligence.").

### 3. Sufficiency of Allegations Against Each Individual

Faced with Plaintiffs' detailed allegations, Individual Providers' and Damron's primary argument for dismissal is that the complaint improperly relies on group pleading and does not differentiate between each Defendant. That argument is unpersuasive. If the complaint had *only* included generalized allegations against Defendants as a group without tying any actions to particular individuals, the court might have been persuaded by their argument. *See Langford v. Joyner*, 62 F.4th 122, 124–25 (4th Cir. 2023). But that is not the case here—far from it. Plaintiffs' complaint sets forth specific allegations against each individual about how he or she interacted with Brad at the Jail and failed to ensure he received proper medical treatment. That the complaint also sometimes refers to "Defendants" as a group does not render it deficient as a matter of law. *See, e.g., Adams v. NaphCare, Inc.*, 243 F. Supp. 3d 707, 711–12 (E.D. Va. 2017).

---

[7] Indeed, as Damron concedes, "the same facts and circumstances that serve as the basis of Plaintiffs' Complaint" resulted in her facing criminal charges for involuntary manslaughter. (ECF No. 33 at 2.)

At bottom, Individual Providers and Damron appear to expect Plaintiffs' complaint to contain far greater detail than what is required—and what is typically achievable without discovery.[8] Plaintiffs do not need to "come to court fully armed with the requisite facts to prove their case" or file a "complaint . . . contain[ing] 'detailed factual allegations.'" *Langford*, 62 F.4th at 126 (quoting *Twombly*, 550 U.S. at 555); *see also Rodwell v. Wicomico Cnty.*, No. CV DKC 22-3014, 2024 WL 1178202, at *3 (D. Md. Mar. 19, 2024) (cleaned up) ("At the pleading stage, a plaintiff is not expected to possess complete knowledge of the defendant's alleged wrongful conduct, but need only submit facts sufficient to plead a plausible claim for relief."). Instead, the complaint only needs to contain "a short and plain statement of the claim showing that [Plaintiffs are] entitled to relief," so that Defendants have "fair notice" of the claims and the grounds upon which they rest. *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (first quoting Fed. R. Civ. P. 8(a)(2); then quoting *Twombly*, 550 U.S. at 555). Plaintiffs' complaint accomplishes this fundamental purpose of notifying Individual Providers and Damron that they are being sued for deliberate indifference and negligence based on their treatment of Brad in the Jail. Their motions to dismiss will be denied.

## B. Wellpath

The court will deny Wellpath's motion to dismiss as well. Wellpath advances two arguments about why the court should dismiss the negligence claims against it: (1) Plaintiffs failed to state negligence claims as to Individual Providers or Damron; and (2) Plaintiffs did not comply with Virginia's pleading requirements.

---

[8] Given the roadblocks Plaintiffs have already run into as part of their early discovery efforts (*see* ECF No. 37), it is unsurprising that they had limited information about certain details for their complaint.

Wellpath's first argument fails because Plaintiffs pleaded negligence claims against Individual Providers and Damron. *See supra* § III.A.2. Because Individual Providers' and Damron's negligent actions allegedly occurred within the course and scope of their employment with Wellpath, the complaint states negligence claims against Wellpath under the doctrine of *respondeat superior*. *See, e.g.*, *Parker v. Carilion Clinic*, 819 S.E.2d 809, 821 (Va. 2018) (discussing Virginia's standard for an employer's vicarious liability).

Wellpath's second argument also falls short because federal procedural law, including the pleading standards in Federal Rule of Civil Procedure 8—not Virginia's pleading standards—apply to Plaintiffs' negligence claims. *See Fuller v. Aliff*, 990 F. Supp. 2d 576, 580 (E.D. Va. 2013) (cleaned up) ("Federal pleading standards are procedural, not substantive, rules, and therefore govern state law claims raised in [federal court]."). Accordingly, Wellpath's arguments based on Virginia's pleading standards are inapplicable here, and Plaintiffs' claims against it will survive.[9]

## IV. CONCLUSION

For these reasons, the court will deny Wellpath's, Individual Providers', and Damron's motions to dismiss for failure to state a claim.

---

[9] Unlike Plaintiffs, the court does not construe Wellpath's briefs as arguing that the negligence claims against it should be dismissed because Plaintiffs did not include an expert certification with their complaint, as contemplated by Va. Code Ann. § 8.01-20.1. To be sure, however, the court agrees with Plaintiffs that their failure to provide that type of certification with their complaint would not serve as a basis for dismissal at this time. *See Andes v. United States*, No. 1:19-cv-00005, 2020 WL 3895780, at *7–9 (W.D. Va. July 10, 2020); *Donovan v. Allen*, No. 7:21-cv-00017, 2021 WL 4443082, at *4 (W.D. Va. Sept. 28, 2021).

The Clerk is directed to forward a copy of this Memorandum Opinion and the accompanying Order to all counsel of record.

**ENTERED** this 6th day of August, 2024.

/s/ Thomas T. Cullen
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE